HOUGHTON COUNTY STREET-RAILWAY CO. *v.* COMMON COUNCIL OF VILLAGE OF LAURIUM.

1. STREET RAILWAYS—FRANCHISE—BRANCH LINE—CONNECTIONS.
    A street-railway company was incorporated, the purpose of which was to construct a road through and accommodate the centers of population in Houghton county, and a line from the village of L. to Lake Linden was specifically mentioned in its articles. The authorities of the village, with knowledge of the localities to be served and the general situation, granted to the company a franchise which authorized an electric road, as a part of its main line, to begin at the southwest corner of the village limits, on C. street (the center of which was the boundary between the village and the adjoining village of F.), thence easterly on said street, and thence in various directions on other streets to the village limits; and the franchise also required the company to run its cars to said village from any terminus of its lines outside the village limits. *Held*, to authorize the company to make a convenient and necessary connection on C. street with a branch line built from Lake Linden through F. to the village boundary on that street. CARPENTER, J., dissenting.

2. SAME—FORFEITURE.
    The right of a street-railway company, under its franchise, to connect its main line in a village with a branch line which it

afterwards built to the village boundary, was not forfeited by its failure to construct the branch within the time fixed for the completion and operation of its main line.

*Certiorari* to Houghton; Streeter, J.   Submitted January 5, 1904.   (Calendar No. 20,266.)   Decided February 16, 1904.

*Mandamus* by the Houghton County Street-Railway Company to compel the common council of the village of Laurium to permit relator to make a certain connection between its tracks.   From an order denying the writ, relator brings *certiorari*.   Reversed.

The relator was organized in 1900 for the purpose of constructing lines of street railway in the county of Houghton.   Its articles of association read:

"We, the undersigned, * * * having associated ourselves together to organize a street railway for the purpose of constructing, owning, maintaining, and using a street railway in the county of Houghton, * * * from the easterly boundary of the village of Houghton, in said county, thence through the streets of said village of Houghton, across Portage Lake, in said county, thence to the village of Hancock, in said county, and along its streets, thence to the villages of Laurium and Red Jacket, across the townships of Quincy, Franklin, Osceola, and Calumet, and along and through the streets of said villages of Laurium and Red Jacket, and to the county of Keweenaw, in the vicinity of the Allouez mine, in said last-named county, and from the village of Laurium aforesaid to the village of Lake Linden, in said county, and through the streets of said last-named village, thence through the townships of Schoolcraft and Torch Lake, and through said townships of Osceola, Quincy, and Franklin, in the county of Houghton aforesaid, to the village of Houghton, in said county, and desiring to become incorporated for that purpose under the provisions of chapter 168, 2 Comp. Laws," etc.

"ART. 2. The purpose for which this corporation is formed is to construct, own, maintain, and use a street railway in the villages and townships above mentioned, in

the county of Houghton, in said State, upon the line and over the streets and highways in said villages and townships above mentioned, and, when constructed, to equip the same with passenger cars, to be propelled by electricity, under the system generally known as the overhead trolley system."

"ART. 5. The operations of this corporation are to be carried on in the county of Houghton, State of Michigan."

Its main line runs from Houghton, through Hancock, Laurium, and Calumet, to Red Jacket. It asked and obtained a franchise from the respondent, the material parts of which are as follows:

"SECTION 1. That permission and authority be and hereby is granted to and vested in the Houghton County Street-Railway Company, a corporation duly organized, its successors and assigns, to hereafter construct, maintain, and operate a double-track electric railway, with all necessary tracks, side tracks, and switches, poles and wires, upon and along the following streets of said village, namely: Commencing on Calumet street, at the extreme southwesterly corner of the limits of the village of Laurium; thence running easterly, on and through Calumet street, to Lake Linden avenue; thence north, on and through Lake Linden avenue, to Hecla street; thence northeasterly, on and through Hecla street, to First street; thence westerly, on and through First street, to Conglomerate street; thence northeasterly, on and through Conglomerate street, to the limits of the village of Laurium; and also, if desired, on Seventh and Florida streets."

Section 2 requires the company to commence the work of construction of said railway within the village of Laurium on or before July 1, 1900, and also requires that the same shall be completed and in full operation along said streets on or before July 1, 1901.

"SECTION 3. Cars shall be run daily upon such street railway, and, so far as practicable, shall be run at regular intervals; and said company, for itself, its successors and assigns, in accepting this ordinance, agrees that the cars from any terminus of the line or line [this evidently should read "lines"] of its railway without the limits of said village of Laurium shall run at regular intervals to said

village of Laurium, without change or transfer, and also that, in the running of its cars and its rates of fares, no discrimination shall be exercised between said village of Laurium and any other city or village."

Section 4 provides for the construction under the supervision and direction of the common council.

Section 5 provides for the form, material, and manner of construction.

All the conditions were complied with by the relator, and a single track was constructed instead of a double track, and was in full operation by July 1, 1901. A branch line was subsequently constructed, running from a point about halfway between the villages of Laurium and Red Jacket to the Wolverine Mining Company's location, where there is a considerable population. Calumet street is the street between the villages of Laurium and Florida, the center line of the street being the boundary line between the two villages. Early in 1903 the relator constructed a line from Lake Linden, situated upon Torch Lake, and reaching Calumet street at the extreme southwestern part of the village, where the population and buildings are sparse. The length of this line is $6\frac{1}{2}$ miles. It approaches Calumet street upon Hancock street, in the village of Florida. There is no street in Laurium opposite Hancock street. The Lake Linden line approaches the main line in Laurium at right angles, running north and south, and between the end of it at the boundary line and the south rail of the railway on Calumet street, in Laurium, is a space of about 11 feet. About 6 feet of this distance, including the embankments, is now occupied by the line on Calumet street, in Laurium; so that in fact there is only a distance of about 5 feet not now used by the relator, to be occupied by making the connection with its main line at this point.

The relator, claiming the right to make the connection with these two lines under its franchise from the respondent, but admitting the right of the respondent, under the franchise, to prescribe the material, manner, etc., of con-

struction, applied to the common council for leave to make this connection, setting forth its plans and specifications, requesting its approval, and, if they should not be approved, that the council then direct what reasonable changes or alterations should be made.   The respondent refused either to approve or direct changes, except upon the imposition of conditions not covered by the franchise above stated. Relator then applied to the circuit court for the county of Houghton for the writ of *mandamus* to compel the council to act as requested.   That court denied the writ, and the case is now before us for review on *certiorari*.

It is deemed important to state the location of the municipalities of Houghton county.   The principal centers of population are as follows:   The villages of Houghton and Hancock, situated on opposite sides of Portage Lake, and containing a population of about 8,000 people; the villages of Calumet and Red Jacket are about 12 miles from Hancock, in a northeasterly direction, and contain a population of about 35,000.   At or near these places are located the great mines of the Calumet & Hecla, Tamarack, and Osceola.   Lake Linden lies in a southerly direction from Calumet, Red Jacket, and Laurium.   At Lake Linden are situated the stamp mills and smelting works of the Calumet & Hecla, and near them, on the shore of the lake, the stamp mills of the Tamarack, Osceola, and Quincy mines.   The population at Lake Linden and vicinity is about 6,500.   Other mining locations are accommodated by the various lines of the relator's road.

*Gray & Stone*, for relator.

*William R. Oates* (*Kerr & Petermann*, of counsel), for respondent.

Grant, J. (*after stating the facts*).   The sole question presented is, Has the relator the right, under the franchise, to connect the two lines at the place designated?

Counsel agree that franchises of this character are to be strictly construed. When, however, the intention of the parties is clear, that intention will be given effect. What the parties, expressly or by necessary implication, contract to give or to do, they must be compelled to give or to do. The purpose of the company was to construct a street railway running through and accommodating all the centers of population within the county of Houghton. The projected road was to run along past the mining locations of the copper range, whose stamp mills are mostly located at and in the vicinity of Lake Linden, and where also are the smelting works of the Calumet & Hecla. The business of these mining companies was carried on at the mines and at the mills. Obviously the travel between them would be considerable. The articles of incorporation were specific, and mentioned three lines as part of the system, viz., that from Houghton to Red Jacket, that from Laurium to Lake Linden and thence to Houghton, and the one to the Allouez mine. The respondent knew the situation and the provisions of the articles of incorporation, and clearly contracted with reference thereto.

While its so-called main line was that running from Houghton to Red Jacket, the other two lines were as much a part of its road as the so-called main line. It was apparently as much to the benefit of the village of Laurium and the traveling public to have an unbroken connection with Lake Linden and vicinity as to have it with Houghton and Hancock. That the parties contracted in reference to these lines is apparent from the language of section 3, by which, for the accommodation of its own inhabitants and all travelers to and from Laurium, the franchise required the company to run cars from any terminus of the line or lines of its road without the limits of said village at regular intervals to said village, and without change or transfer, and without any discrimination between said village of Laurium and any other city or village. No such language would have been used if but one line had been contemplated, running between Houghton and Red

Jacket. One of the things which the relator unequivocally contracted to do was to connect all the lines of its road, so that cars should run from any terminus outside the village along its track or tracks within the village without change or transfer. This was obviously for the accommodation of the inhabitants of the village of Laurium and travelers thereto. If the relator contracted to do this, the respondent certainly contracted to give it the right to do it. No place was fixed for this union of the Lake Linden line with the other lines. It follows that the parties contemplated and contracted for a union at a place convenient both to the relator and to the inhabitants of Laurium and those having occasion to travel over the road to Laurium. It is apparently conceded that the relator has constructed its Lake Linden line for the convenience of the public and of itself. It is virtually conceded upon this record that the point of union is a proper, convenient, and necessary one. No claim is made by the respondent that the company either ought to or could have constructed its road so as to make connections outside the village of Laurium. It is a fair inference from the record that the Lake Linden line was contemplated as finally constructed. It runs through the village of Florida, and naturally the understanding was that it should be built to accommodate the people of that village as well as those of Laurium.

Let us reverse the proposition: If the relator, having constructed its road to Calumet street at the point designated, had refused, upon the request of the authorities of the village of Laurium, to connect this line with the other line at that point, would not its refusal have been in violation of its contract? A contract, to be binding, must be mutual, and what the relator contracted to do, the respondent, by the same instrument, contracted to give it the right to do. By the ordinance (section 3) the relator contracted to run all its cars without change to the village of Laurium. " To " means within, not up to. It was not a compliance with the terms of the contract for the relator to construct its road up to the boundary line of the village.

It is therefore clear that the franchise granted to the relator the right to connect the Lake Linden line with the other line at some convenient and proper place, and was not limited to a connection outside the village of Laurium. If the Lake Linden line had been constructed within a year, probably no question would have arisen as to the right to connect the two.

The only other question is, Is that right lost or forfeited by the failure to construct the Lake Linden line within the time fixed for the construction of the road through the village of Laurium? If this contention prevail, it follows that the company has lost all right to construct a double track because two tracks were not constructed within the time. The ordinance, under the authorities, gave the right to construct a second track whenever the necessities and business of the company required. *City of Burlington* v. *Burlington St.-Ry. Co.*, 49 Iowa, 144 (31 Am. Rep. 145); *Ransom* v. *Citizens' St.-Ry. Co.*, 104 Mo. 375 (16 S. W. 416). See, also, *Detroit Citizens' St.-Ry. Co.* v. *Board of Public Works of Detroit*, 126 Mich. 554 (85 N. W. 1072).

The occupation of about five feet of the street in the manner and at the place designated creates no additional burden upon the street. The connection is clearly for the accommodation of the inhabitants of Laurium, and as well all travelers over the road, and is in accordance with the terms of the franchise. The right to make the connection has not been forfeited by the failure to construct the Lake Linden line before July 1, 1901. Besides, the road was constructed along the designated streets in the village of Laurium within the time provided. The right to connect with other lines was not limited as to time.

Judgment reversed, and judgment entered in this court for the relator.

MOORE, C. J., MONTGOMERY and HOOKER, JJ., concurred with GRANT, J.

CARPENTER, J. (*dissenting*). Relator proposes to lay

a track in respondent's street to connect its line in said village with a branch line running to Lake Linden. Is the right to build this track granted by relator's franchise? The granting part of that franchise is contained in section 1, which reads as follows:

"That permission and authority be and hereby is granted to and vested in the Houghton County Street-Railway Company * * * to hereafter construct, maintain, and operate a double-track electric railway, with all necessary tracks, side tracks, and switches, poles and wires, upon and along the following streets of said village, viz. : Commencing on Calumet street, at the extreme southwesterly corner of the limits of the village of Laurium; thence running easterly, on and through Calumet street, to Lake Linden avenue; thence [and here follows an enumeration of streets, not material to the case]."

I think it clear that the right to construct the proposed track is not granted in this section. It surely is not a track "upon and along" Calumet street. Neither is it a side track or switch necessary to the operation of said track.

Is the right to construct the proposed track granted by section 3 of said franchise? Said section, so far as material to the question under consideration, reads:

"And said company, for itself, its successors and assigns, in accepting this ordinance, agrees that the cars from any terminus of the line or lines of its railway without the limits of said village of Laurium shall run at regular intervals to said village of Laurium, without change or transfer."

This provision, and, indeed, all the provisions of this section, impose obligations upon the grantee of the franchise. It is not the section in which we would naturally expect to find a grant to the relator. Nevertheless, I think it should be presumed that relator was granted everything necessary to enable it to perform the obligations imposed upon it by respondent. It is insisted that under this rule there passed to relator a grant to construct in the streets of respondent village a track to connect its Lake Linden branch with its line on Calumet street. To this

proposition I cannot assent.  Relator did not agree to construct its Lake Linden line to Laurium.  At most, it agreed that the cars on said line should run to Laurium. We cannot infer that, when the franchise in question was granted, the route of the line from Laurium to Lake Linden was determined.  Where the two lines would be connected was therefore not known, either to relator or to respondent.  It is obvious that the point of connection would be subsequently determined by relator.  In making that determination, relator was not, in my judgment, bound by the contract with respondent to select a place convenient to the inhabitants of Laurium and those having occasion to travel over the road.  The obligation of relator to run its cars over the Lake Linden branch into Laurium did not affect the right of relator to determine the point of connection of its two lines.  If relator had chosen, as it might, to make this connection outside the village of Laurium, it could have run the cars on the Lake Linden line into the village, as it agreed, without laying any other track.  We cannot say, therefore, that the right to lay the track in question is necessarily implied by the obligation of relator to run its cars from this line into the village of respondent; and it is well settled, in the construction of grants of this character, that nothing passes unless it is expressly granted or necessarily implied.  See *Coolidge* v. *Williams*, 4 Mass. 140; *Charles River Bridge* v. *Warren Bridge*, 11 Pet., at page 547; *Grant* v. *Leach*, 20 La. Ann. 329 (96 Am. Dec. 403); *Sprague* v. *Birdsall*, 2 Cow. 419; Cooley, Const. Lim. (6th Ed.) 486, 487.

It is true that the relator's proposed track in the respondent village is very short, and perhaps it may not seriously damage the street; but, in my judgment, it is a clear invasion of respondent's rights, and should not be permitted.  If relator can build this track to permit a connection at this point, I am unable to see any reason why it should not select the point of connection to suit its convenience, and build whatever tracks are necessary to effect a juncture there.  Indeed, it is stated in relator's brief:

" We might well argue from these cases [cases which I think are clearly distinguishable from the one under consideration] that this very section of the ordinance gives the relator the right to run its Lake Linden branch to some convenient point within the village of Laurium, even using some of the streets of the village if necessary to reach such point; but we do not, of course, take that position."

An argument leading to such a conclusion is, in my judgment, unsound. Even if we construe the franchise liberally to the grantee, — and it should be construed strictly against it ( see *Detroit Citizens' St.-Ry. Co.* v. *City of Detroit*, 110 Mich., at page 394 [68 N. W. 304, 35 L. R. A. 859, 64 Am. St. Rep. 350]),—no such grant could, in my judgment, be implied.

I cannot agree to the proposition that "the record shows that the point of union [of the two lines] is a proper, convenient, and necessary one," and that "the Lake Linden line was contemplated as finally constructed." By its petition relator claimed the right, under the ordinance in question, to connect said Lake Linden line with its line on Calumet street by building a side track or switch. Respondent denied this right, averring that "the construction of a branch railway from Lake Linden, entering said village of Laurium, and connecting with said relator's main line in said village, was in no way contemplated or authorized by any ordinance enacted by respondent." Respondent's denial is as broad as relator's claim. In my judgment, there is nothing in relator's petition to suggest that the point of connection was a necessary one, or that the Lake Linden line was contemplated as finally constructed. As relator did not plant its case on this ground, the failure of respondent to deny it is of no significance.

This question is asked :

" If relator, having constructed its road to Calumet street at the point designated, had refused, upon the request of the authorities of the village of Laurium, to con-

nect this line with the other line at that point, would not its refusal have been in violation of its contract?"

I answer "Yes," and I also say that, if respondent insists upon this connection, it must permit relator to make it.   I also say that, if relator's Lake Linden branch had been constructed to some point at respondent village so remote from its line in that village that it could only reach the same by laying a mile of track in a street not designated in its franchise, respondent could have insisted upon the connection being made, and would have been obliged to permit the laying of the track necessary to effect it.   I apprehend that this would be true even if relator had expressly promised to make connection without laying additional track in respondent's street.   The right of relator to lay the track in these supposed cases arises, not from its original contract, but from relator's undertaking a particular method of performing that contract, and respondent's insistence upon the execution of that method.   In the case at bar, respondent objects to the execution of that method of performance, and the question before us is whether it ever granted relator the right to perform its contract by that method.   In my judgment, we cannot say from the record before us that it did.

I think that relator is not entitled to the *mandamus,* and that the decision of the court below should be affirmed.